UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MELVIN FRANK SHERMAN, III,
   *Plaintiff*,

v.

JOHN DOE, ET AL,
   *Defendants*.

No. 3:22-cv-1159 (VAB)

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Melvin Frank Sherman, III (the "Plaintiff"), filed a Complaint *pro se* against Dr. Rommell Geronimo; Nurses Arial Swan-Daly and Susette Kelo; Correctional Officers Cassidy, Cienik, and Marios-Etman; counselor supervisor Dumas ("Mr. Dumas"); Connecticut Department of Correction ("DOC"); Commissioner Angel Quiros; former DOC Commissioner Rollin Cook; former Corrigan Warden Corcella; and John or Jane Doe, Director of Hartford Healthcare (collectively, "Defendants") under 42 U.S.C. § 1983 for violation of his rights under the United States Constitution and under state law. Compl., ECF No. 1 (Sept. 14, 2022) ("Compl.").

In its Initial Review Order, the Court permitted Mr. Sherman to proceed on his Fourteenth Amendment substantive due process claim against Nurse Swan-Daly; Eighth Amendment sexual abuse claim against Nurse Swan-Daly; Eighth Amendment deliberate indifference claim against Lieutenant Dumas; and state law assault and battery claims against Nurse Swan-Daly in their individual capacities. *See* Initial Review Order, ECF No. 26 at 2 (April 7, 2023).

Before the Court is the Defendants' motion for summary judgment and supporting memorandum. *See* Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment ECF Nos. 59, 59-1 (Jan. 7, 2025). The Court has reviewed the motion and the record in this matter.

For the following reasons, the motion for summary judgment is **GRANTED**.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

   A.  **Factual Allegations**

At the times relevant to the Complaint and motion for Summary Judgment, Mr. Sherman allegedly suffered from an infected first, second or third degree burn on his right foot, a shoulder injury, and kidney failure. Compl. ¶¶ 34, 39.

On September 13, 2019, Mr. Sherman was allegedly admitted to Backus Hospital for kidney failure after he had engaged in a hunger strike at Corrigan while he was in the behavioral observation cell. *Id.* ¶ 17–23. He allegedly went on the hunger strike because the medical staff did not treat him for a shoulder injury after he was placed in the behavioral observation cell. *Id.* ¶ 23–24.

During Mr. Sherman's hunger strike, medical staff allegedly failed to monitor him or see him for treatment. Id. ¶ 25. Lieutenant Dumas allegedly called Mr. Sherman to his office to discuss his hunger strike, but Mr. Sherman allegedly fainted while he was walking. *Id.* Mr. Sherman allegedly woke up at Backus Hospital but still refused any food or water and any medical treatment. *Id.* ¶ 26. He allegedly requested to be transferred out of Corrigan and provided with proper medical treatment for his bone degeneration condition. *Id.*

 Defendant RN Swan-Daly allegedly lied to Mr. Sherman by telling him that the DOC Commissioner and Backus Hospital had a court order to force him to take food, medical

2

treatment, and intravenous fluids. *Id.* ¶ 27. She allegedly stated that even if Mr. Sherman resisted, he would not be allowed to die because security guards would be called; he would be shackled, tubes would be forced down his throat; his nose would be held; and medication would be forcibly administered. *Id.* According to Mr. Sherman, when he asked to see the court order, papers were held up in front of him, but he could not see them closely. *Id.* ¶ 28. He allegedly requested to see a supervisor, but his request was denied. *Id.* ¶ 29. A doctor and an unknown woman allegedly came to see Mr. Sherman, but he was not permitted to see the papers or to call his family on the telephone. *Id.* He allegedly objected to the denial of his use of the telephone at the hospital because no one, not even his family, knew he was in the hospital. *Id.* ¶ 30.

When Nurse Swan-Daly allegedly asked to check his vitals, he allegedly said nothing. *Id.* ¶ 31. Nurse Swan-Daly then allegedly grabbed his arm and later poured him two cups of water that she instructed him to drink. *Id.* Mr. Sherman allegedly refused to do so. *Id.* Mr. Sherman alleges that, after he refused to drink the water, a guard told him that there was a court order and threatened him with violence. *Id.* ¶ 32.

Mr. Sherman then allegedly drank the water. *Id.* ¶ 33. Nurse Swan-Daly allegedly poured more water, although he allegedly told her his stomach and penis hurt and he needed to urinate. *Id.* Nurse Swan-Daly, however, allegedly ignored Mr. Sherman for hours and failed to examine him. *Id.* According to Mr. Sherman, he kept pushing the button to complain about his groin pain, but Nurse Swan-Daly allegedly yelled at him to urinate in the plastic bottle and told him to drink more water. *Id.* Nurse Swan-Daly allegedly obtained a fluid measuring tool, which allegedly showed his bowels were 98% full. *Id.* Later, Mr. Sherman's penis was allegedly "swab[bed]." *Id.* ¶ 34. Nurse Swan-Daly allegedly "shoved" a tube up his penis for him urinate, and then took blood from him by stabbing him several times with a sharp needle. *Id.* ¶ 35. Mr. Sherman

appears to claim that he was falsely diagnosed with a urinary infection. *See id.* ¶¶ 34, 40 ("The urina[ry] infection. Lie!").

At this time, Mr. Sherman was allegedly still requesting to see the court order and to use the telephone; he was also allegedly still refusing medical treatment. *Id.* ¶ 36.

Later that day, Mr. Sherman was allegedly discharged wearing only his gown during a rainstorm. *Id.* ¶ 40. Mr. Sherman had allegedly been considered a threat despite his weakened state after a seventeen-day hunger strike, injuries from being beaten and burned, and being chained to a bed with two guards surrounding him. *Id.* ¶ 41. Mr. Sherman alleges that there was no court order and that he posed no threat. *Id.* ¶ 42.

At Corrigan (presumably before Mr. Sherman's hospital admission), Lieutenant Dumas had allegedly permitted Mr. Sherman's foot "to rot," watched him starve to death, and heard his requests for a transfer out of Corrigan as he made his daily rounds. *Id.* ¶ 43.

On February 23, 2022, in *Sherman v. Corcella et al.*, 3:19-cv-01889-SVN, Mr. Sherman allegedly signed a settlement agreement and release in which he agreed to:

> release and forever discharge the defendants and all other present and former officers and employees of the State of Connecticut, their heirs, successors and assigns, from all actions, causes of action, suits, claims, controversies, damages and demands of every nature and kind, including attorneys' fees and costs, monetary and equitable relief, which the plaintiff, his heirs, successors and assigns ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the effective date of this Release and Settlement Agreement, including such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Connecticut, any state or federal administrative agency or before the Claims Commissioner pursuant to Conn. Gen. Stat. § 4-141, et seq.
>
> Memorandum in Support of Motion for Summary Judgment, ECF No. 59-1 at 2 ("Mot."); Exhibit B to Motion for Summary Judgment, ECF No. 59-3 at 2–3 (Jan. 7, 2025) ("Release").

Mr. Sherman further allegedly agreed that the "release of liability includes, but is not limited to, all causes of action alleging violations of the plaintiff's state and federal constitutional rights, his rights arising under the statutes and laws of the United States and/or the State of Connecticut, and such causes of action as may be available under the common law." Mot. at 3; Release at 3. In return, Mr. Sherman allegedly received seven thousand two hundred and thirty-five dollars ($7,235.00). Release at 4; Exhibit C to Mot., ECF No. 59-5 at 2.

### B. Procedural History

On September 14, 2022, Mr. Sherman filed a Complaint *pro se* against Dr. Rommell Geronimo; Nurses Arial Swan-Daly and Susette Kelo; Correctional Officers Cassidy, Cienik, and Marios-Etman; counselor supervisor Dumas; Connecticut Department of Correction ("DOC"); Commissioner Angel Quiros; former DOC Commissioner Rollin Cook; former Corrigan Warden Corcella; and John or Jane Doe, Director of Hartford Healthcare (collectively, "Defendants") under 42 U.S.C. § 1983 for violation of his rights under the United States Constitution and under state law. Compl.

On that same day, Mr. Sherman filed a motion to appoint counsel. Motion to Appoint Counsel, ECF No. 4 (Sept. 14, 2022).

On September 19, 2022, Mr. Sherman filed a motion for partial summary judgment. Motion for Partial Summary Judgment, ECF No. 10.

On September 30, 2022, Mr. Sherman filed a motion for a temporary restraining order and a preliminary injunction. Motion for Temporary Restraining Order Motion for Preliminary Injunction, ECF No. 14.

On November 10, 2022, the Court denied Mr. Sherman's motion for a for a temporary restraining order and a preliminary injunction. Order, ECF No. 20.

On December 7, 2022, Mr. Sherman filed another motion for a temporary restraining order and a preliminary injunction. Motion for Temporary Restraining Order Motion for Preliminary Injunction, ECF No. 23.

On April 7, 2023, the Court issued its initial review order allowing Mr. Sherman to proceed on his Fourteenth Amendment substantive due process claim against Nurse Swan-Daly; Eighth Amendment sexual abuse claim against Nurse Swan-Daly; Eighth Amendment deliberate indifference claim against Lieutenant Dumas; and state law assault and battery claims against Nurse Swan-Daly in their individual capacities. Initial Review Order, ECF No. 26.

On April 10, 2023, the Court granted Mr. Sherman's motion to appoint counsel and denied Mr. Sherman's *pro se* motions for partial summary judgment, temporary restraining order, and preliminary injunction. Order, ECF No. 27.

On November 26, 2024, Mr. Dumas filed his Answer to Mr. Sherman's Complaint. Answer, ECF No. 57.

On December 10, 2024, Mr. Dumas filed a motion to bifurcate pretrial proceedings to litigate the issue of whether Mr. Sherman's claims are barred by release before proceeding to the merits of the Mr. Sherman's underlying claims and the remaining defenses. Motion to Bifurcate Pretrial Proceedings, ECF No. 58.

On January 7, 2025, Mr. Dumas filed his motion for summary judgment. Mot.

On January 24, 2025, Mr. Sherman filed a consent motion for extension of time to object to the motion to summary judgment until February 18, 2025. Consent Motion for Extension of Time, ECF No. 60.

On January 27, 2025, the Court granted Mr. Sherman's motion for extension of time. Order, 61.

On January 28, 2025, the Court granted Mr. Dumas' motion for bifurcation.

At the time of the publishing of this Ruling and Order, Mr. Sherman has not responded to Mr. Dumas' motion for summary judgment.[1]

## II.   STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113–14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense…." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party meets this burden, "the

---

[1] The fact that Mr. Sherman has not filed a response to the motion for summary judgment has no bearing on the merits of the motion for summary judgment and the Court will consider whether the law requires the Court to grant or deny the motion. *See e.g.*, *Maturine v. Am. Int'l Grp., Inc.*, No. 04 CV 9064 (GBD), 2006 WL 3206098, at *4 (S.D.N.Y. Nov. 6, 2006) ("Plaintiff's failure to file any formal opposition papers has no bearing on the determination of whether summary judgment in favor of the defendants is warranted."); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir.2006) ("'[T]hat the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion.'") (alterations in original) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 438 (2d Cir.1999)).

party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). To defeat a motion for summary judgment, the nonmoving party "must offer such proof as would allow a reasonable juror to return a verdict in his favor[.]" *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

"In determining whether there are genuine issues of material fact, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotations omitted). Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

### III. DISCUSSION

Under Connecticut law, a court must construe the language of a written contract to give effect to "the intent of the parties," which a court determines "from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 290, 838 A.2d 135 (2004) (quoting *Poole v. City of Waterbury*, 266 Conn. 68, 87–88, 831 A.2d 211 (2003)). In doing so, a court must accord the language "common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Id.* If the language is "clear and unambiguous, the contract is to be given effect according to its terms." *Id.*

"'It is well settled that a release, being a contract whereby a party abandons a claim to a person against whom that claim exists, is subject to rules governing the construction of contracts.'" *Giano v. Salvatore*, 46 A.3d 996, 1002 (Conn. App. 2012) (quoting *Embalmers' Supply Co. v. Giannitti,* 103 Conn. App. 20, 42, 929 A.2d 729, *cert. denied*, 934 A.2d 246 (2007)). "Once entered into," a settlement agreement "is binding and conclusive*." Ruiz v. City of Bridgeport*, No. 15 Civ. 253 (AWT), 2017 WL 1202651, at *2 (D. Conn. Mar. 31, 2017) (quoting Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir. 2007).

Mr. Dumas argues that Mr. Sherman entered into a settlement in *Sherman v. Corcella et al.*, 3:19-cv-01889-SVN where he released all State of Connecticut employees from any and all claims arising prior to the date the last party signed the agreement: March 7, 2022. Mot. at 3. Because of that, Mr. Dumas argues that all of Plaintiff's claims against him are barred. *Id.*

The Court agrees.

The settlement here releases all claims brought by Mr. Sherman against State of Connecticut employees from all causes of actions violating Mr. Sherman's rights within a specific time frame:

> "Plaintiff" shall mean Melvin Sherman, . . . "Effective Date" shall mean the date on which this Agreement is executed by the last Party to execute it. . . . [T]he plaintiff shall, effective of the Effective Date, release and forever discharge the defendants and all other present and former officers and employees of the State of Connecticut, their heirs, successors and assigns, from all actions, causes of action, suits, claims, controversies, damages and demands of every nature and kind, including attorneys' fees and costs, monetary and equitable relief, which the plaintiff, his heirs, successors and assigns ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the effective date of this Release and Settlement Agreement, including such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Connecticut, any state or federal administrative agency or before the Claims Commissioner pursuant to Conn. Gen. Stat. § 4-141, et seq. Said release of liability includes, but is not limited to, all causes of action alleging violations of the plaintiff's state and federal constitutional rights,

9

his rights arising under the statutes and laws of the United States and/or the State of Connecticut, and such causes of action as may be available under the common law."

Release at 2–3 (last party executed on March 7, 2022).

Such releases have been found valid under Connecticut law in various contexts, including the release of claims by a prisoner against state employees. *See e.g.*, *Brown v. Uconn Managed Health Care*, No. 3:13-CV-931 (JBA), 2016 WL 777888, at *3 (D. Conn. Feb. 26, 2016) (granting summary judgment against an incarcerated *pro se* plaintiff when "the plaintiff signed a release of liability, in which he specifically releases any employees of the Department of Correction or Correctional Managed Health Care from claims he has or might have in the future that are related to the issues in the four settled cases."); *Johnson v. Naqvi*, No. 3:18-CV-694 (CSH), 2021 WL 1723773, at *20 (D. Conn. Apr. 29, 2021) (finding that an incarcerated plaintiff's claims were barred by a prior release) ("According to Plaintiff, his agreement covered only the 'parties of that suit not parties of future suits.' The Court disagrees with Plaintiff. The agreement not only applies to the defendants of that case, but also, contrary to Plaintiff's assertion, to 'all other present and former ... employees of the State of Connecticut.' Courts in this Circuit have rejected similar arguments where the settlement agreements at issue released claims against all state employees. The wording of the instant release, creating the broadest possible shield for the released party, is explicitly intended to achieve that result . . .") (internal citations omitted) (citing various cases, including *Brown*, 2016 WL 777888); *see also William Padula v. Ted Dinsmore*, No. 3:24-CV-913 (VAB), 2025 WL 950722, at *8 (D. Conn. Mar. 28, 2025) (finding that a release and settlement agreement released the parties from future claims because "Connecticut's courts, including the Connecticut Supreme Court, have consistently held private parties in commercial settings to the bargains contained in broad releases specifically

covering future claims.") (citing *Tallmadge Bros., Inc. v. Iroquis Gas Transmission Sys., L.P.*, 252 Conn. 479, 481 (Conn. 2000) and *Merrick v. Cummin*, 919 A.2d 495, 499 (Conn. App. 2007)).

Given the nature of the broad bargained-for release in this case, the Court will uphold the parties' agreement. *See Viera v. Cohen*, 927 A.2d 843, 854 (Conn. 2007) ("A release is an agreement to give up or discharge a claim. It terminates litigation or a dispute and is meant to be a final expression of settlement.") (internal quotation marks and citations omitted).

Accordingly, Mr. Sherman's Complaint will be dismissed.

### A. Leave to Amend

Under Federal Rule of Civil Procedure 15(a),

> [a] party may amend its pleading once as a matter of course no later than: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* The district court has broad discretion to decide a motion to amend. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998).

Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting that leave to amend may be

denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)"). "[A] motion for leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Phillip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006) (citing *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003)); *see also Kim v. Kimm*, 884 F.3d 98, 105–06 ("Therefore, because the proposed amendments would have no impact on the basis for the district court's dismissal and would consequently be futile, the district court did not abuse its discretion in denying [the plaintiff] leave to amend." (citing *Ellis*, 336 F.3d at 127)).

Because Mr. Sherman's claims are barred by release, leave to amend on those claims would be futile. *See e.g.*, *Crabtree v. Hope's Windows, Inc.*, No. 3:17-CV-01709 (VAB), 2018 WL 2436992 at *11 (D. Conn. May 30, 2018) ("Given that the Release bars Mr. Crabtree's claim of products liability, the Court denies Mr. Crabtree's motion to amend because, even if timely, it would be futile."); *Genao v. Ruiz*, No. 24-CV-2077 (LJL), 2025 WL 219160, at *7 (S.D.N.Y. Jan. 16, 2025) ("Based on the Court's foregoing analysis of the enforceability of the General Release, granting Plaintiff leave to amend would be futile.") (citing various other Southern District of New York cases denying leave to amend due to underlying claims being barred by release); *Long v. Corning Inc.*, 847 F. App'x 74, 76 (2d Cir. 2021) (summary order) ("Nor did the District Court err in denying Long leave to amend his complaint, in light of the release of claims to which Long agreed in the separation agreement with Corning.").

Accordingly, Mr. Sherman's Complaint will be dismissed with prejudice.

### IV.   CONCLUSION

Because Mr. Sherman's claims are barred by release, the Court **GRANTS** the Defendants' Motion for Summary Judgment, ECF No. 59, and **DISMISSES** Mr. Sherman's

Complaint, ECF No. 1, with prejudice.

The Clerk of Court is respectfully directed to enter judgment and close this case.

**SO ORDERED** at New Haven, Connecticut, this 22nd day of August, 2025.

                                          /s/ Victor A. Bolden
                                          VICTOR A. BOLDEN
                                          UNITED STATES DISTRICT JUDGE